# United States Court of Appeals
## For the First Circuit

No. 23-1003

CAITLIN CORRIGAN,

Plaintiff, Appellant,

v.

BOSTON UNIVERSITY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Gelpí, Selya, and Thompson,
Circuit Judges.

Robert N. Meltzer, with whom Mountain States Law Group was on brief, for appellant.
Thomas M. Elcock, with whom Prince Lobel Tye, LLP, Jennifer C. Pucci, and Boston University Office of the General Counsel were on brief, for appellee.

April 12, 2024

**SELYA**, <u>Circuit Judge</u>.  Faced with grim statistics at the height of the COVID-19 pandemic, universities collaborated with medical and scientific experts in an all-out effort to implement community-wide testing programs designed to safeguard the health and safety of those who set foot on their campuses. Notwithstanding these efforts, the fit was sometimes imperfect. When one such university, defendant-appellee Boston University (BU), implemented a mandatory testing program, plaintiff-appellant Caitlin Corrigan — a graduate student at the time — claimed that she could not comply due to a chronic medical condition.  She further claimed that requiring her compliance with the program would violate the Americans with Disabilities Act (ADA), <u>see</u> 42 U.S.C. §§ 12111-12213.  Litigation ensued.

The district court did not reach the merits of Corrigan's claims.  Instead, the court dismissed Corrigan's suit for want of subject-matter jurisdiction on the theory that it had become moot once BU ended its mandatory testing program.  Concluding, as we do, that the district court appropriately applied mootness principles to dismiss Corrigan's suit and that Corrigan has not shown that her case comes within an applicable exception to those mootness principles, we affirm the order of dismissal.

I

We briefly rehearse the relevant facts and travel of the case.

- 2 -

**A**

In the fall of 2020, the COVID-19 pandemic raged relentlessly throughout the nation. This circumstance prompted BU to mandate that its students — even if asymptomatic — undergo regular testing for the virus. To accomplish this goal, BU opened an on-campus laboratory so that it could conduct polymerase chain reaction (PCR) testing for the virus.[1] The university also set up a website that allowed it to broadcast information about university protocols as rapidly as practicable.

Time marched on, however, and by March of 2022, the pandemic was in decline. This decline led BU to terminate its mandatory testing program in May of that year. By then, BU also had relaxed other COVID-19 protocols (such as its masking requirement).

Corrigan enrolled as a graduate student in BU's School of Theology in the fall of 2021. She immediately cited a chronic medical condition and invoked the ADA to apply for an exemption from BU's mandatory testing program. BU rejected her proposed exemption and (she says) refused to negotiate with her. As a

---

[1] In COVID-19 testing, PCR — "a common laboratory technique used . . . to amplify, or copy, small segments of genetic material" — is run with fluorescent dyes that mark virus genetic material to measure how much of that genetic material appears in a human sample. *Understanding COVID-19 PCR Testing,* NAT'L HUMAN GENOME RSCH. INST., https://perma.cc/QU6R-BW2E (last visited Apr. 2, 2024).

- 3 -

result, she was out of compliance with the university's protocol, and BU suspended her for the fall semester.

Although Corrigan was advised that she would be welcome to return to her academic pursuits after her suspension — assuming that she adhered to the mandatory testing program — she never returned to campus. Nor has she since attempted to reenroll as a student at BU.

This was not the end of the matter. Rather than attempting to repair her relationship with the university, Corrigan sued BU, alleging that BU had violated Title III of the ADA.[2] See Corrigan v. Boston Univ., No. 22-10443, 2022 WL 11218108, at *1 (D. Mass. Oct. 19, 2022).

B

BU moved to dismiss Corrigan's suit for want of subject-matter jurisdiction, and the district court — applying mootness principles — granted the motion.[3] See id. Because BU had ended

---

[2] The portion of the statute upon which Corrigan relied makes clear that discrimination on the basis of disability includes the "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the[ir] nature." 42 U.S.C. § 12182(b)(2)(a)(ii).

[3] Corrigan repeatedly mischaracterizes the district court's opinion as granting BU's Rule 12(b)(6) motion. The district court, however, made no such ruling. Indeed, such a ruling would have been grossly improper once the district court had held the case to be moot. The only issue properly on appeal is the district court's

Case 1:22-cv-10442-DJC Document 38 Filed 04/12/24 Page 5 of 10

its mandatory testing program, the court determined that an order requiring BU to provide Corrigan with a reasonable accommodation to the program would have had no effect. After all, "there [was] no ongoing conduct to enjoin." Id. at *4 (quoting Town of Portsmouth v. Lewis, 813 F.3d 54, 58 (1st Cir. 2016)). The court added that "issuance of a declaratory judgment deeming past conduct illegal [was] also not permissible as it would be merely advisory." Id. (quoting Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops (ACLUM), 705 F.3d 44, 53 (1st Cir. 2013)). In the court's view, this general rule should be relaxed only if "there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. (quoting Lewis, 813 F.3d at 59). But "[n]o such immediacy or reality exist[s] here." Id.

In support of this reasoning, the district court noted that "BU's mandatory testing program ended on May 23, 2022, and nothing in the record suggests that the program will be revived — let alone with the sufficient immediacy and reality to overcome a mootness challenge." Id. And although Corrigan advanced two potential exceptions to save her suit from mootness, the court ruled that neither exception had any footing in the facts of this case. See id. at *5-7. The voluntary cessation exception was

---

grant of BU's Rule 12(b)(1) motion for want of subject-matter jurisdiction.

inapplicable because BU stopped its mandatory testing program for a reason unrelated to Corrigan's suit (the waning severity of the pandemic) and BU was unlikely "to impose a [program] 'similar' enough to the old [program] to present substantially the same legal controversy as the one presented by [Corrigan's] complaint." Id. at *6 (alterations in original) (quoting Resurrection Sch. v. Hertel, 35 F.4th 524, 529 (6th Cir. 2022)).

So, too, the district court found inapplicable the exception for cases which, though capable of repetition, might otherwise evade review. See id.; see, e.g., Spencer v. Kemna, 523 U.S. 1, 18 (1998) (holding that habeas petition had become moot after petitioner was released from second stint of incarceration following parole revocation because he had failed to show that "time between parole revocation and expiration of sentence is always so short as to evade review" and that he again likely would face parole revocation); Murphy v. Hunt, 455 U.S. 478, 481-84 (1982) (holding that defendant's challenge to denial of pretrial release had become moot after he was convicted because he would have been entitled to pretrial release only if his convictions were reversed but had shown no more than a possibility of reversal); cf. Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 462-64 (2007) (holding that advocacy group's challenge to statute prohibiting certain campaign ads was not moot even though elections had concluded because election cycle was too

short to obtain complete judicial review and advocacy group planned to run similar ads in future elections); Neb. Press Ass'n v. Stuart, 427 U.S. 539, 546-47 (1976) (holding that challenge to restraining order against press coverage of trial that expired after jury empanelment was not moot because such orders are short lived and press was likely to dispute similar orders in the future). The court pointed out that Corrigan's claim was not inherently transitory (BU's mandatory testing program had been in place for nearly two years) and BU was unlikely to subject Corrigan to mandatory testing again. Corrigan, 2022 WL 11218108, at *7.

Finally, the court held that the monetary relief that Corrigan sought was legally insufficient to support a claim of jurisdiction. See id. at *5. Under applicable precedents, the court maintained, Corrigan's prayer for monetary relief could not resurrect an otherwise moot case because she asked for damages without including a specific dollar amount.[4] See id.; see also Harris v. Univ. of Mass. Lowell, 43 F.4th 187, 192-93 (1st Cir. 2022) (explaining that, although damages can salvage case when unavailability of equitable relief otherwise would render it moot,

---

[4] Although the parties do not develop the point on appeal, we pause to note that such a request for damages would be irrelevant in all events because monetary damages are unavailable under Title III of the ADA. See G. v. Fay Sch., 931 F.3d 1, 9 (1st Cir. 2019) (explaining that, "[b]y the plain terms of that provision [of the ADA], . . . damages for past harms are not available" (first and third alterations in original) (quoting Goodwin v. C.N.J., Inc., 436 F.3d 44, 51 (1st Cir. 2006))).

complaint failed to include "any specific request for damages"). And a catchall "request for 'any other relief [the] Court deems proper' cannot operate to save [an] otherwise moot action." Corrigan, 2022 WL 11218108, at *5 (alterations in original) (quoting Harris, 43 F.4th at 193). In like fashion, "an 'interest in attorneys' fees [or costs] is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim.'" Id. (second alteration in original) (quoting Harris, 43 F.4th at 193).

This timely appeal followed.

## II

We next proceed to note some applicable legal standards.

### A

"Article III of the Constitution grants the federal judiciary the authority to adjudicate cases and controversies, see U.S. Const. art. III, § 2, cl. 1, but that authority extends only to live cases and controversies, not to those which are or have become moot." In re Sundaram, 9 F.4th 16, 18 (1st Cir. 2021). In this regard, "the key question 'is whether the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation).'" Bos. Bit Labs, Inc. v. Baker, 11 F.4th 3, 8 (1st Cir. 2021) (quoting Air Line Pilots Ass'n, Int'l v. UAL Corp., 897 F.2d 1394, 1396 (7th Cir. 1990)).

The burden of showing mootness is a heavy one — and it rests squarely with the proponent of the issue. See id.

**B**

As a general matter, we review the district court's mootness determinations de novo. See id. "The ultimate question of whether jurisdiction exists . . ., however, may turn on or be influenced by the district court's role as the decider of disputed facts." Amoche v. Guar. Tr. Life Ins. Co., 556 F.3d 41, 48 (1st Cir. 2009). That is, "a district court faced with a factual challenge under Rule 12(b)(1) ordinarily must resolve disputed facts (or, at least, choose among competing inferences from subsidiary facts). . . . [And] such findings will be set aside only if clearly erroneous." Valentín v. Hosp. Bella Vista, 254 F.3d 358, 365 (1st Cir. 2001). For "mixed question[s] of law and fact, the same deferential standard of review endures." Id.

In first reviewing the facts, "we must accept the [district] court's findings and the conclusions drawn therefrom unless the whole of the record leaves us with 'a strong, unyielding belief that a mistake has been made.'" Id. (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)). Our next step is to "determine whether the facts, as supportably found, justify the court's ultimate legal conclusion." Id. at 365-66 (emphasis in original).

- 9 -

III

On its face, this case presents a classic illustration of mootness: the university requirement that led the parties to a parting of the ways is no longer operative, and Corrigan does not seriously dispute that conclusion. Yet, two exceptions to the rule of mootness may be relevant — and Corrigan deploys both exceptions in furtherance of her claims.

A

The voluntary cessation exception applies in situations in which "a 'defendant voluntary[ily] ceases the challenged practice' in order to moot the plaintiff's case, . . . and there exists 'a reasonable expectation that the challenged conduct will be repeated following dismissal of the case.'" Lewis, 813 F.3d at 59 (first alteration in original) (quoting ACLUM, 705 F.3d at 54, 56). To qualify for this exception, the defendant's conduct also must be "sufficiently similar to the [past conduct such] that it is permissible to say that the challenged conduct continues." Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 662 n.3 (1993).

"[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 190 (2000).

- 10 -

Otherwise, "a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off; it might even repeat 'this cycle' as necessary until it achieves all of its allegedly 'unlawful ends.'" FBI v. Fikre, 601 U.S. ___, ___ (2024) [No. 22-1178, slip op. at 6] (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)).

Although the university ceased the challenged conduct on its own volition, the circumstances are such as to persuade us that this posturing is not of concern. As the district court supportably found: "After almost two years in place, BU retired the program not in response to Corrigan's lawsuit, but rather because of more favorable trends in regard to COVID-related illnesses and hospitalizations." Corrigan, 2022 WL 11218108, at *6. This development also explains why the university is unlikely to repeat the challenged conduct. Because it is absolutely clear that BU ended its mandatory testing program in response to encouraging public health data and there are no signs that the pandemic will worsen, it is not reasonable to expect that BU again will impose a similar testing program.

**B**

This leaves the capable-of-repetition-yet-evading-review exception. To gain the benefit of this exception, "a plaintiff [must] show that '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or

- 11 -

expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" ACLUM, 705 F.3d at 57 (quoting Gulf of Me. Fisherman's All. v. Daley, 292 F.3d 84, 89 (1st Cir. 2002)). As to the first element, "the claims [must be] inherently transitory . . . [or there must be] a realistic threat that no trial court ever will have enough time to decide the underlying issues." Cruz v. Farquharson, 252 F.3d 530, 535 (1st Cir. 2001).

Corrigan has failed to establish either of these elements. It is struthious at best to suggest that a resource-intensive effort continuously spanning almost two years is so fleeting that a court could never have time to pass on its legality. Indeed, we previously have observed that "[c]hallenges to university-vaccination policies are not among or closely analogous to the 'inherently transitory' claims that the Supreme Court has previously found to fit this exception." Harris, 43 F.4th at 194. And as we explained earlier, BU ended the mandatory testing program in response to promising public health data. Thus, it is not reasonable to expect that the university again will impose a similar program in the absence of a future public health concern (the sole justification for the original program).

We also summarily reject Corrigan's argument that the capable-of-repetition-yet-evading-review exception "is a catch-all when dealing with 'exceptional circumstances.'" This argument

- 12 -

inverts the Court's reasoning in City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983). The exception does not permit a court to salvage an otherwise moot case whenever "exceptional circumstances" weigh in favor of adjudicating the claims but, rather, "applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." Id. As we have discussed, Corrigan cannot make this showing.

## IV

Refined to bare essence, Corrigan suggests three reasons why her suit is not moot. First, she asserts that, in applying the mootness exceptions, the district court misread Boston Bit Labs and Lewis because those cases were rendered moot based on considerations that are inapplicable here. Second, she asserts that the district court misconstrued the facts in applying the mootness exceptions. Third, she asserts that the district court ignored the import of the ADA's scheme for providing prospective relief. None of these assertions moves the needle.

### A

Corrigan first challenges the district court's discussion of Boston Bit Labs and Lewis as they pertain to the analysis — required by both mootness exceptions — of whether there was a reasonable expectation that Corrigan again would be subjected to sufficiently similar conduct. The crux of the matter in Boston

- 13 -

Bit Labs, as Corrigan views it, involved the governor of Massachusetts issuing executive orders — under the authority of a state statute that permitted such action in times of emergency — to ensure the safety of residents during the pandemic.  See 11 F.4th at 7.  Once the governor rescinded these executive orders, Corrigan's thesis runs, further executive action would have required a new declaration of emergency subject to the constraints of the state statute and judicial review.  See id.  It was, therefore, "'absolutely clear' that the supposedly 'wrongful behavior could not reasonably be expected to recur'" because there would have been no justification (as required by state law) for invoking the governor's emergency authority in the latter months of the pandemic.  Id. at 11 (quoting Bayley's Campground, Inc. v. Mills, 985 F.3d 153, 158 (1st Cir. 2021)).

The case at hand is a horse of a different hue.  Here, the university retains the authority to institute a mandatory testing program at any time without similar legal constraints.  Corrigan insists, therefore, that BU's mere representations about ending its mandatory testing program do not make it "absolutely clear" that there is a reasonable expectation that BU will not again subject her to a testing program.  (Quoting id.).

This insistence is composed of more cry than wool.  As we observed in Boston Bit Labs, "[t]hat the Governor has the power to issue executive orders cannot itself be enough to skirt

- 14 -

mootness, because then no suit against the government would ever be moot." 11 F.4th at 10. In the same vein, that BU retains authority to impose a mandatory testing program on students by itself cannot keep a suit alive. Although BU does not have the additional burden of complying with a state statutory scheme, its decisions must remain sensitive to internal organizational constraints and its responsibilities to students, faculty, and staff. Put bluntly, imposing a mandatory testing program in the absence of a full-fledged pandemic would be an unjustifiable expenditure of resources and place an unnecessary burden on the school's community members such that there is no reasonable expectation that BU will reinstate a similar testing program with which Corrigan must comply.

In Lewis, we observed that the challenged conduct (tolls imposed by the state of Rhode Island) was unlikely to recur because the Rhode Island legislature had repealed the enabling statute. See 813 F.3d at 58. Although the governor had proposed new tolls and the state senate had passed a bill that reauthorized tolls, "the capital infrastructure for collecting the tolls ha[d] been dismantled, [which] hardly [represented] the behavior of a defendant that intended to return to its old ways upon dismissal of a case." Id. at 60. The legal authority for the challenged tolls could have been restored, but we nonetheless held that the conduct was unlikely to recur based on factual developments. See

- 15 -

id. Similarly, BU was dismantling the extensive infrastructure that it had developed solely for its testing program during the height of the pandemic. These costly and time-consuming moves — during a time of financial hardship for universities — "hardly [represent] the behavior of a defendant [seeking] to return to its old ways upon dismissal of a case." Id.

**B**

Corrigan's factual challenge fares no better. In mounting it, Corrigan seemingly disputes the district court's finding that BU ended its mandatory testing program based on the incidence of more favorable public health data and was unlikely to resume a similar one that also would ensnare her (as required by both mootness exceptions). She contends that BU made only oral promises to end the mandatory testing program, and these promises later were cast into grave doubt by a suggestion that the university would continue with testing. These promises, she suggests, are the equivalent of showing a receipt for a portable ADA-compliant ramp purchased online with the intent of installing it at some point, instead of hiring a designer, obtaining the necessary building permits, and signing a contract with a construction company to construct professionally an ADA-compliant ramp (a much more permanent course of action).

In parsing this suggestion, we look to the relevant facts as the court found them and intervene only where a factual finding

- 16 -

is clearly erroneous or a legal conclusion is incorrect. See Valentín, 254 F.3d at 365. In March and April of 2022, BU issued several statements announcing that the mandatory testing program would end in May of that year. See Corrigan, 2022 WL 11218108, at *3. The mandatory testing program subsequently lapsed in May, and BU never reinstated the program as it no longer was necessary given the waning severity of the pandemic. See id. What is more, Corrigan did not reenroll as a student at BU after her suspension even after the mandatory testing program's discontinuation. See id.

We can discern no clear error in connection with the district court's account of these events. Indeed, Corrigan's only evidence to the contrary is an announcement — presented without any context — that, although the "United States [was] 'out of the pandemic phase,'" BU would continue testing. As the district court correctly explained, though, "[m]ere speculation that a defendant will repeat challenged conduct cannot rescue an otherwise moot claim." Id. at *7; see Harris, 43 F.4th at 195 (holding that possibility that students would return to universities — after one transferred and another graduated — and again be subjected to their COVID-19 vaccination policies "rest[ed] on 'speculation' about some future potential event" (quoting Pietrangelo v. Sununu, 15 F.4th 103, 106 (1st Cir. 2021))).

- 17 -

The supposedly contradictory statement that Corrigan presents suggests only that BU would continue with some sort of testing program. It does not suggest that the testing program would be mandatory for everyone or even that it would be mandatory for Corrigan specifically. And, moreover, it remains unclear whether Corrigan even intends to return to the university at this point. Corrigan is left prognosticating about a hypothetical scenario in which BU reinstates a similar testing program with which she must comply upon reentering the university at some unspecified time.

## C

Corrigan has one last blade in her scabbard. She contends that the district court fundamentally misunderstood her claim because BU's "violation of the ADA [was] not the testing mandate per se, but [its] arrogant assertion that it need not comply with the ADA on its own whim." In denying her prospective relief, she maintains, the district court overlooked that the ADA was drafted to counteract this type of situation — a situation in which an entity is dodging compliance with the statute through shifty procedural moves. But despite the harshness of her rhetoric, she has nowhere in the record identified any evidence to support such an allegation. To the contrary, BU has repeatedly disputed Corrigan's claims that it violated the ADA, including

through its filing of a motion to dismiss on the merits. See Fed. R. Civ. P. 12(b)(6).

BU is contending at most that the legality of its conduct cannot be adjudicated under our constitutional framework. As the university's brief points out, no matter how important the fundamental rights vindicated by the ADA may be, they cannot supersede the constitutional threshold for a federal court to assume jurisdiction.[5] See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) ("Federal courts . . . . possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." (internal citations omitted)).

And even assuming that BU clearly had stated an intent to violate the ADA in the future — and we do not think that it has — Corrigan would have to show a "material risk of future harm" from this intended violation that is "sufficiently imminent and substantial" to "satisfy the concrete-harm requirement" of standing before a federal court could grant her any relief. Webb

---

[5] Even assuming that BU had violated the ADA in the past, Corrigan fails to prove that the violation resulted in the harm necessary to invoke federal jurisdiction. Title III of the ADA does not provide for damages, see Fay Sch., 931 F.3d at 9; attorneys' fees alone are legally insufficient to confer standing, see Harris, 43 F.4th at 193; and a declaratory judgment deeming past conduct illegal would be an impermissible advisory opinion, see ACLUM, 705 F.3d at 53.

v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 375 (1st Cir. 2023) (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 435 (2021)). Yet, as we concluded earlier, not only is there no imminent risk of substantial harm to Corrigan from a testing program at BU, but there is also good reason to believe that BU is unlikely to reinstate a testing program with which she must comply.

In response, Corrigan raises the Supreme Court's recent decision in 303 Creative LLC v. Elenis, 600 U.S. 570 (2023), which purportedly "reaffirm[ed] the doctrine of preventative injunction, enjoining actual peril of constitutional violation which is likely or imminent." But 303 Creative is readily distinguishable because no constitutional claim exists here (disability is not a protected class under the Constitution, and there is no state action). Moreover, the Court explicitly held that the plaintiff there had standing because she had shown "a credible threat of sanctions unless she conform[ed] her views to the State's" before it reached the merits of the case. Id. at 597. Not so here: Corrigan has shown no comparable threat of harm.

V

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**